**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
AKRON DIVISION**

| | |
|---|---|
| **DANIELA POULTON**<br>5171 Beckett Ridge<br>Stow, OH 44224<br><br>and<br><br>**CHARLES A. POULTON**<br>5171 Beckett Ridge<br>Stow, OH 44224<br><br>               Plaintiffs,<br><br>   v.<br><br>**SPECIALIZED LOAN SERVICING, LLC**,<br>c/o United Agent Group Inc.<br>119 E. Court Street<br>Cincinnati, OH 45202<br><br>            Defendant. | Civil Case No.<br><br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiffs Daniela Poulton and Charles A. Poulton through counsel, states as follows for their *Complaint for Damages* (the "Complaint") against Defendant Specialized Loan Servicing, LLC:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiffs Daniela Poulton ("Daniela") and Charles A. Poulton ("Charles") (collectively, "Plaintiffs" or the "Poultons") are the owners of the real property and improvements located thereupon located at and commonly known as 5171 Beckett Ridge, Stow, OH 44224 (the "Home").

2.      Plaintiffs currently occupy and maintain the Home as their primary, principal residence and have maintained the Home as such for all times relevant to the causes of action pleaded in this Complaint.

3.      On August 26, 2005, the Poultons executed a promissory note in the amount of $81,266.00 (the "Note") and executed a mortgage on the Home purportedly securing the Note (the "Mortgage") (collectively, the "Loan"). *See*, a copy of the Loan documents, attached as **Exhibit 1**.

4.      Defendant Specialized Loan Servicing, LLC ("Defendant" or "SLS") is a foreign limited liability company registered to do business in the State of Ohio, with its corporate headquarters located at 1 Mortgage Way, Mount Laurel, NJ 08054.

5.      SLS is the current servicer of the Loan and has serviced the Loan at all times relevant to the causes of action pleaded in this Complaint.

6.      SLS services the Loan on behalf of the purported assignee of the Loan, non-Party UMB Bank, National Association, legal title trustee for LVS Title Trust 2018-1 ("UMB") and has acted with its authority or otherwise on its behalf in relation to the Loan at all times relevant to the causes of action pleaded in this Complaint.

7.      SLS obtained servicing rights to the Loan from non-party PNC Bank effective May 5, 2012. *See*, a copy of Notice of Assignment, Sale, or Transfer of Servicing Rights dated May 8, 2012, attached as **Exhibit 2**.

8.      Per SLS's records, the Loan was in default and past due for the March 1, 2012 payment, and any payments due thereafter, at the time SLS obtained servicing rights to the Loan on May 5, 2012.

9.      Jurisdiction is conferred by 28 U.S.C. § 1331 as this action primarily arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. (RESPA) and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692, *et seq.*

10.     This Court has supplemental jurisdiction to hear any state law statutory and common law claims pleaded, *infra*, or that otherwise may arise pursuant to 28 U.S.C. § 1367.

11.     Venue is appropriate within this District pursuant to 28 U.S.C. § 1391(b) as: (1) A substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District; and, (2) the Home, the property that is the subject of the action, is located within this District.

## SUMMARY OF CAUSES OF ACTION

12.     Plaintiffs file this action in substantial part to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

13.     In January 2013, the CFPB issued final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

14.     Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013) which became effective on January 10, 2014.

15.     Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

16.     Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties[1]." 12 U.S.C. § 2605(k)(1)(C).

17.     The Loan is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

18.     SLS is subject to the aforesaid regulations and does not qualify for the exemption for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4).

19.     SLS is not a "qualified lender", as defined in 12 C.F.R. § 617.700.

20.     The Poultons assert claim for relief against SLS for violations of the specific rules under RESPA and Regulation X, as set forth, *infra.*

21.     The Poultons have a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f), for the violations claimed, *infra*, and such actions provide for remedies including actual damages, statutory damages, and attorneys' fees and costs.

22.     The Poultons are each a "consumer", as that term is defined by 15 U.S.C. § 1692a(3), and a person affected by a violation of the FDCPA, and other violations, with standing to bring this claim under 15 U.S.C. § 1692.

---

[1] "The Bureau believes that standard servicer duties are those typically undertaken by servicers in the ordinary course of business. Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also those duties that are defined as ''servicing'' by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. *These standard servicer duties are not limited to duties that constitute ''servicing,'' as defined in this rule, and include, for example*, duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, *and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans*." 78 Fed. Reg. 10696, 10739 (emphasis added).

23.     SLS is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as SLS began collecting on the Loan when the Loan was past due and in default.

24.     The Loan is a "debt" as that term is defined by the FDCPA as the underlying debt sought to be collected by SLS was a residential mortgage the primary purpose of which was for personal, family, or household use.

25.     The Poultons have a private right of action under the FDCPA pursuant to 15 U.S.C. § 1692k, for the violations claimed, *infra*, and such actions provide for remedies including actual damages, statutory damages, and attorneys' fees and costs.

26.     The Poultons further assert a state law statutory claim for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

27.     The Poultons are each a "buyer" as defined by R.C.1322.01(H), as each is an individual whose mortgage is serviced by a mortgage servicer, SLS.

28.     SLS is a mortgage servicer under the RMLA as it "holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement." R.C. 1322.01(AA).

29.     SLS is subject to the requirements of the RMLA and does not qualify for the exemptions listed in R.C. 1322.04.

## STATEMENT OF FACTS

### (Loan Modification and the Maturity of the Loan)

30.     In 2009, the Poultons suffered from a financial setback and sought loss mitigation assistance from non-party E*Trade Financial, the servicer of the Loan at the time.

31.     In November 2009, the Poultons executed and returned a "Modification Acceptance Letter" concerning the Loan (the "Modification") along with the first modified payment due thereunder. *See*, a copy of the Modification, attached as **Exhibit 3**.

32.     The terms of the Modification were as follows:

- The new interest rate will be 3.25% for 24 months.
- The first modified payment will be due on November 27, 2009 in the amount of $646.46.
- All currently outstanding late fees will be waived
- Any and all other terms and conditions of the above loan not specifically mentioned in this letter will remain unchanged.
- All funds collected for the loan modification are non-refundable and will be applied to your account balance.

*See*, Exhibit 3.

33.     Neither the terms of the Modification nor E*Trade Financial informed the Poultons that entering into the Modification would have any negative impact or consequences upon the amortization of the Loan nor that there would be any balloon payment due and owing on the Loan upon the maturity of the Loan.

34.     On or about November 30, 2009, E*Trade Financial, through Specialist Misty Bray, prepared a worksheet titled "Loss Mitigation Modifications" commemorating, memorializing, and delineating the differences in the terms, interest rate, and amounts owed under the terms of the Loan and as modified through the Modification (the "Worksheet"). *See*, a copy of the Worksheet, attached as **Exhibit 4**.

35.     Per the Worksheet, once modified:

a.    The interest rate for the Loan would change from 7.75% to 3.25%;

b.    The due date for the Loan would change from September 1, 2009 to January 1, 2010;

c.    The remaining term of the Loan would remain at 139 months;

    d.   The monthly payment amount would change from $764.94 to $646.46;

    e.   Late fees of $1114.72 would be waived;

    f.   Interest payments of $561.39 were waived; and,

    g.   Any balloon payment owing on the Loan would remain at $0.00.

*See*, <u>Exhibit 4</u>.

36.    The Poultons continued to remit their monthly payments under the terms of the Loan as modified per the Modification to E*Trade Financial, then PNC Bank, and finally SLS as instructed by each such entity through the periodic billing statements related to the Loan.

37.    After remitting all monthly payments of principal and interest claimed due and owing on the Loan through the end of the Loan's term, upon maturity of the Loan—on September 1, 2020—SLS claimed the Borrowers still owed $27,314.76 in *unpaid principal*, payable as a balloon payment.

38.    Had the Poultons been advised that through the Modification they would only reduce their monthly payment by approximately $100.00, but be required to remit a balloon payment upon maturity in excess of $27,000.00, the Poultons would not have entered into the Modification.

39.    Had the amortization for the Loan not been altered or negatively impacted through the implementation of the Modification without notification, the Loan would have been paid in full as of the maturity date.

40.    Upon information and belief, the Modification was not properly implemented and/or the Poultons' payments thereunder were not properly applied to the Loan as modified through the stated terms of the Modification.

41.     The Poultons made numerous attempts to contact SLS to ascertain why there was a balloon payment due and owing on the Loan and to have SLS rectify and correct any errors causing such a balloon payment to exist, but such attempts proved fruitless with SLS merely claiming that the amounts were owed.

**(Attempts to Obtain Information to Investigate and Attempts to Have SLS Correct Errors)**

42.     Unable to remit the funds for balloon payment being demanded as due and owing by SLS, the Poultons retained counsel to assist with obtaining information as to the Loan, researching potential errors on the part of SLS as to the Loan, and to seek to have SLS correct any such errors related to the Loan.

43.     On or about August 11, 2021, the Poultons, through counsel, sent correspondence captioned "Request for Information Pursuant to 12 C.F.R. § 1024.36" to SLS via certified U.S. Mail [Tracking No. 70210350000161131227] ("RFI #1") at the address designated by SLS for borrowers to send notices of error pursuant to 12 C.F.R. § 1024.35 and requests for information pursuant to 12 C.F.R. § 1024.36 (the "Designated Address"). *See*, a copy of RFI #1 along with tracking information from the website for the United States Postal Service (USPS) (www.usps.com), attached as **Exhibit 5**.

44.     Through the RFI, the Poultons requested information related to the servicing of the Loan including, *inter alia*, a transaction history for the Loan, servicing notes for the Loan, and correspondence concerning loss mitigation attempts as to the Loan. *See*, Exhibit 5.

45.     SLS received RFI #1 at the Designated Address on or before August 16, 2021. *See*, Exhibit 5.

46.      SLS sent correspondence in response to RFI #1 dated August 23, 2021 (the "RFI Response"). *See*, a copy of the RFI Response, without enclosures, attached as **Exhibit 6**.

47.     Through the Response, SLS failed to provide a full transaction history for the Loan, as requested, instead only providing a history containing transactions for the loan dating back to May 21, 2012.

48.     As the Poultons had, on numerous occasions, expressed concern about the accounting of the Loan since the Modification, SLS knew or should have known that a transaction history dating back at least as far as the implementation of the Modification was of utmost importance.

49.     Had SLS provided a full accounting of the Loan as requested through RFI #1, the Poultons and their counsel may have been more readily able to determine why there was an unpaid principal balance of $27,314.76 owed upon the maturity of the Loan and what specific errors created the untenable situation in which the Poultons find themselves.

50.     On or about August 11, 2021, the Poultons, through counsel, sent correspondence captioned "Notice of error pursuant to 12 C.F.R. §§ 1024.35(b)(5) and/or (11) for failing to properly servicing the loan so as to create an undisclosed balloon payment and for otherwise imposing an undisclosed balloon payment; notice of errors pursuant to 12 C.F.R. §§ 1024.35(b)(11) for sending incorrect periodic billing statements for the loan" to SLS via certified U.S. Mail [Tracking No. 70211970000099473111] ("NOE #1") at the Designated Address. *See*, a copy of NOE #1 along with tracking information from the website for the USPS (www.usps.com), attached as **Exhibit 7**.

51.     SLS received NOE #1 at the Designated Address on or before November 8, 2021. *See*, Exhibit 7.

52.     Through NOE #1, the Poultons alleged that SLS committed multiple errors in relation to Loan, including, but not limited to:

    a. Improperly servicing the Loan in a manner so as to create an unwarranted balloon payment, misapplying payments[2], or otherwise affecting the amortization of the Loan through the Modification in an improper manner; and,

    b. Sending incorrect periodic billing statements each month since the implementation of the Modification in that SLS had claimed incorrect amounts due and owing for principal and interest each month which could have potentially necessitated or otherwise caused the existence of the balloon payment.

*See*, Exhibit 7.

53. SLS sent correspondence dated December 6, 2021 purportedly in response to NOE #1 (the "NOE Response"). *See*, a copy of the NOE Response, attached as **Exhibit 8**.

54. SLS, through the NOE Response, stated that no errors occurred because:

> SLS records [*sic*] indicate that the remaining balance due on the above referenced second mortgage loan account **is not due to any balloon payment** [emphasis added]. Per the terms of original Note [*sic*], in Section 3 "Payments" it states in part:
> *"If on September 1, 2020 I still owe amounts under the note, I will pay all those amounts, in full, on that date."* [Emphasis in original.]
> The 2009 loan Modification executed with prior servicer E-Trade states in part:
> *"Any and all other terms and conditions of the above loan not specifically mentioned in this letter will remain unchanged."* [Emphasis in original.]

*See*, Exhibit 8.

55. That is, through the NOE Response, SLS wholly failed to address the errors alleged through NOE #1 that the Modification or the implementation thereof improperly affected the

---

[2] Through NOE #1, the Poultons specifically note that, had the Loan as modified been properly amortized and the amounts remitted under the Loan properly applied, "[u]pon the end of the Loan's term, the [Poultons'] final payment should have consisted nearly entirely of amounts due and owing to principal. Rather, the [Poultons'] final payment consisted of $467.04 going towards principal and $179.42 going towards interest." *See*, Exhibit 7.

amortization of the Loan which resulted in the principal of the Loan not being paid off in full as well as any of the errors concerning the periodic billing statements. *See*, Exhibits 7 and 8.

56.     Instead, SLS merely relied upon a clause in the Note stating that all unpaid amounts under the Loan are due and payable upon the maturity of the Loan without any consideration as to whether there being an unpaid principal balance of $27,314.76 was proper. *See*, Exhibit 8.

57.     Further, it is confusing that SLS through the NOE Response claims that the remaining balance of unpaid principal "is not due to any balloon payment" the payment of the remaining unpaid principal balance is, in and of itself, a balloon payment. *See*, Exhibit 8.

58.     Any reasonable investigation into the errors alleged through NOE #1 would have resulted in SLS having fully responded to all of the errors alleged concerning the existence and amount of the unpaid principal balance of $27,314.76 claimed due and owing rather than whether unpaid amounts upon maturity are to be paid per the terms of the Loan.

59.     On or about February 8, 2022, the Poultons, through counsel, sent a notice of error captioned "Notice of error pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to properly respond to a request for information in violation of 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1)(E); request for copies of documents pursuant to 12 C.F.R. § 1024.35(e)(4); notice of error pursuant to 12 C.F.R. §§ 1024.35(b)(5) and/or (11) for failing to properly service the loan so as to create an undisclosed balloon payment and for otherwise imposing an undisclosed balloon payment; notice of error pursuant to 12 C.F.R. § 1024.35(b)(11) for failing to properly respond to a notice of error as required by 12 C.F.R. § 1024.35" ("NOE #2") to SLS at the Designated Address via certified U.S. mail [Tracking No. 70201290000141258576]. *See*, a copy of NOE #2, without enclosures, along with tracking information from the website for the USPS (www.usps.com), attached as **Exhibit 9**.

60. Through NOE #2, the Poultons alleged that SLS committed multiple errors in relation to Loan, including, but not limited to:

    a. Failing to properly respond to RFI #1;

    b. Failing to properly respond to NOE #1;

    c. Reiterating the errors previously alleged through NOE #1, but including additional information not previously provided with NOE #1 that is likely to change SLS's determination as to whether any errors occurred.

*See*, Exhibit 9.

61. Through NOE #2, the Poultons further requested that SLS provide copies of any documentation relied upon in SLS's investigation into NOE #1 pursuant to 12 C.F.R. § 1024.35(e)(4). *See*, Exhibit 9.

## IMPACT UPON AND DAMAGES SUFFERED BY PLAINTIFF

62. SLS's actions in, *inter alia*, improperly servicing the Loan so as to create an undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan which the Poultons cannot reasonably afford has caused the Poultons to become delinquent on the Loan and suffer credit diminution.

63. Due to the manufactured default resulting from SLS's actions, SLS has further issued notices of its intent to foreclose to the Poultons, threatening foreclosure if the Poultons fail to pay for the improper, undisclosed balloon payment.

64. SLS's improper actions caused the Poultons to suffer from actual and proximate damages including, but not limited to:

    a. Legal fees, costs, and expenses to submit RFI #1, NOE #1, and NOE #2, to SLS in a good faith attempt to obtain information as to the Loan and to otherwise

attempt to amicably resolve this matter or to have SLS mitigate the harm caused to the Poultons to which the Poultons did not receive a proper or adequate response;

b. Unwarranted harm to their credit rating and a significant delay in the rehabilitation of their credit for failing to remit payment of the unwarranted, improper and undisclosed balloon payment SLS has demanded upon the maturation of the Loan for which the Poultons have not received proper redress from SLS;

c. Improper fees and charges imposed on the Loan since the maturation of the Loan including late fees and other default servicing related fees for which the Poultons is personally obligated or which otherwise negatively impacts any equity in the Home to which they are entitled; and,

d. Severe emotional distress driven by this unnecessary delinquency and by fear that this unnecessary, manufactured default would be the start of a slippery slope leading to a foreclosure of their Home unless the Poultons pay amounts and fees which are not warranted which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

**PATTERN AND PRACTICE OF REGULATION X VIOLATIONS BY SLS**

65. SLS's actions are part of a pattern and practice of behavior in violation of the Poultons' rights and in abdication and contravention of SLS's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA. SLS's actions are part of a pattern and practice of behavior in violation of the Poultons' rights and in abdication and contravention of SLS's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

66.     As of the filing of this Complaint, consumers nationwide have lodged One Thousand Sixty Seven (1,067) consumer complaints with the CFPB against SLS, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan servicing, payments, escrow account" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints/.

67.     As of the filing of this Complaint, consumers nationwide have lodged One Thousand Five Hundred Fourteen (1,514) consumer complaints with the CFPB against SLS, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints/.

68.     The Poultons have reviewed the CFPB's consumer complaint database and have identified allegations of similar conduct and alleged RESPA violations by SLS from other consumers. The Poultons have specifically reviewed the narratives from the ten (10) consumer complaints attached hereto and identified as **Composite Exhibit 10**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints evidence conduct showing that SLS has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## COUNT ONE:
## VIOLATIONS OF 12 C.F.R. § 1024.36(d) AND 12 U.S.C. § 2605(k)

### (Failure to properly respond to RFI #1)

69.     The Poultons restate and incorporate all of the statements and allegations contained in paragraphs 1 through 68 in their entirety, as if fully rewritten herein.

70.     12 C.F.R. § 1024.36(a) provides, in relevant part, that a request for information may consist of "any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

71.     Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of the borrower."

72.     A servicer must respond to a request for information by:

(i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

(ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.36(d)(1).

73.     Furthermore, a servicer must properly respond to a request for information within the following deadlines:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

(B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

12 C.F.R. § 1024.36(d)(2)(i); *see also* 12 U.S.C. §§ 2605(e)(2) and 12605(k)(1)(E).

74.     RFI #1 is a request for information as defined by 12 C.F.R. § 1024.36(a) as it contains the Poultons' names, loan number, property address, and requests information related to the Loan, specifically, *inter alia*, a transaction history for the Loan, servicing notes for the Loan, and correspondence concerning loss mitigation attempts as to the Loan. *See*, Exhibit 5.

75.     The Poultons sent RFI #1 to the Designated Address and SLS received the same at such address on or before August 16, 2021. *See*, Exhibit 5.

76.     SLS was required to provide a written response to RFI #1 within thirty (30) days of August 16, 2021 excluding legal public holidays, Saturdays, and Sundays. *See*, Exhibit 5; 12 C.F.R. § 1024.36(d)(2)(i)(B).

77.     SLS sent the RFI Response in response to RFI #1 on or about August 23, 2021. *See*, Exhibit 6.

78.     To date, neither the Poultons nor their counsel have received any further correspondence in response to RFI #1.

79.     Through the Response, SLS failed to provide a full transaction history for the Loan, as requested, instead only providing a history containing transactions for the loan dating back to May 21, 2012. *See*, Exhibit 6.

80.     Any statement contained in the RFI Response that SLS reasonably determined that one of the exceptions delineated in 12 C.F.R. § 1024.36(f)(1) absolved SLS from its obligation to respond to RFI #1 is clearly inappropriate and any such determination was clearly unreasonable as a request for an accounting history for the Loan, when such had been challenged on numerous occasions, does not seek an unreasonable volume of documents, does not seek confidential or proprietary information, nor is it unduly burdensome. *See*, Exhibit 5.

81.     As the Poultons had, on numerous occasions, expressed concern about the accounting of the Loan since the Modification, SLS knew or should have known that a transaction history dating back at least as far as the implementation of the Modification was of utmost importance.

82.     Had SLS provided a full accounting of the Loan as requested through RFI #1, the Poultons and their counsel may have been more readily able to determine why there was an unpaid principal balance of $27,314.76 owed upon the maturity of the Loan and what specific errors created the untenable situation in which the Poultons find themselves.

83.     SLS's failure to provide proper written response to RFI #4/NOE #1 constitutes a violation of 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k) and has caused the Poultons to suffer actual damages as detailed, *supra*, including, but not limited to legal fees, expenses, and costs to prepare and send NOE #2 to SLS at the Designated Address which would not have been necessary but for SLS'S failure to properly respond to RFI #1. *See*, Exhibit 9.

84.     SLS's actions are part of a pattern and practice of behavior in conscious disregard for the Poultons' rights and in abdication of SLS's obligations under RESPA and Regulation X.

85.     SLS's conduct as pleaded, *supra*, shows a conscious disregard for the Poultons' rights and SLS's obligations under RESPA and Regulation X.

86.     As a result of SLS's actions, SLS is liable to the Poultons for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

87.     Additionally, the Poultons request reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

### COUNT TWO:
### VIOLATIONS OF 12 C.F.R. § 1024.35(e) AND 12 U.S.C. §§ 2605(e) AND (k)

### (Failure to properly respond to NOE #1)

88.     The Poultons restate and incorporate all of the statements and allegations contained in paragraphs 1 through 68 in their entirety, as if fully rewritten herein.

89.     "A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a)

90.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower." Supplement I to Part 1024.

91.     A servicer must respond to a notice of error by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i); *see also* 12 U.S.C. § 2605(e)(2)(B).

92.     A servicer must respond to a notice of error in compliance with 12 C.F.R. § 1024.35(e)(1):

(A) Not later than seven days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error for errors asserted under paragraph (b)(6) of this section.

(B) Prior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the

notice of error, whichever is earlier, for errors asserted under paragraphs (b)(9) and (10) of this section.

(C) For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error.

12 C.F.R. § 1024.35(e)(3)(i); *see also* 12 U.S.C. § 2605(e)(2).

93. "A servicer of a federally related mortgage shall not...fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

94. A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

95. NOE #1 constitutes a notice of error as defined by 12 C.F.R. § 1024.35(a) as it is, in part, a "written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." *See*, Exhibit 7.

96. SLS received NOE #1 at the Designated Address on or before November 8, 2021. *See*, Exhibit 7.

97. Through NOE #1, the Poultons alleged that SLS committed multiple errors in relation to Loan, including, but not limited to:

a. Improperly servicing the Loan in a manner so as to create an unwarranted balloon payment, misapplying payments, or otherwise affecting the amortization of the Loan through the Modification in an improper manner; and,

b. Sending incorrect periodic billing statements each month since the implementation of the Modification in that SLS had claimed incorrect amounts due and owing for principal and interest each month which could have potentially necessitated or otherwise caused the existence of the balloon payment.

*See*, Exhibit 7.

98.     SLS was required to send a written response to NOE #1 meeting the requirements of 12 C.F.R. § 1024.35(e) within thirty (30) days of receipt, excluding legal public holidays, Saturdays, and Sundays of November 8, 2021. *See*, 12 C.F.R. § 1024.35(e)(3)(i)(C).

99.     SLS sent the NOE Response in response to NOE #1 on or about December 6, 2021. *See*, Exhibit 8.

100.     To date, neither the Poultons nor their counsel have received any further correspondence in response to NOE #1.

101.     SLS, through the NOE Response, failed to fulfill its obligations as to 12 C.F.R. § 1024.35(e)(1)(i)(A) as SLS did not admit that any errors occurred as alleged in NOE #1. *See*, Exhibits 7 and 8.

102.     SLS, through the NOE Response, did not fulfill its obligations as to 12 C.F.R. § 1024.35(e)(1)(i)(B), as it is clear from the face of NOE #1 and the NOE Response that SLS did not perform a reasonable investigation into the errors alleged through \NOE #1 prior to determining that no such errors occurred. *See*, Exhibits 7 and 8.

103.     Specifically, SLS through the NOE Response, wholly failed to address the errors alleged through NOE #1 that the Modification or the implementation thereof improperly affected

the amortization of the Loan which resulted in the principal of the Loan not being paid off in full as well as any of the errors concerning the periodic billing statements. *See*, Exhibits 7 and 8.

104.    Instead, SLS merely relied upon a clause in the Note stating that all unpaid amounts under the Loan are due and payable upon the maturity of the Loan without any consideration as to whether there being an unpaid principal balance of $27,314.76 was proper. *See*, Exhibit 8.

105.    Further, it is confusing that SLS through the NOE Response claims that the remaining balance of unpaid principal "is not due to any balloon payment" the payment of the remaining unpaid principal balance is, in and of itself, a balloon payment. *See*, Exhibit 8.

106.    Any reasonable investigation into the errors alleged through NOE #1 would have resulted in SLS having fully responded to all of the errors alleged concerning the existence and amount of the unpaid principal balance of $27,314.76 claimed due and owing rather than whether unpaid amounts upon maturity are to be paid per the terms of the Loan.

107.    SLS's failure to properly respond to NOE #1 by failing to correct its errors or to otherwise perform a reasonable investigation into and otherwise properly respond to the errors alleged through NOE #1 constitute violations of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(e) and (k) and, as a result, the Poultons have suffered actual damages as detailed, *supra*, including, but not limited to legal fees, expenses, and costs to prepare and send NOE #2 to SLS at the Designated Address which would not have been necessary but for SLS's failure to properly respond to NOE #1. *See*, Exhibits 8 and 9.

108.    SLS's actions are part of a pattern and practice of behavior in conscious disregard for the Poultons' rights and in abdication of SLS's obligations under RESPA and Regulation X.

109.    SLS's conduct as pleaded, *supra*, shows a conscious disregard for the Poultons' rights and SLS's obligations under RESPA and Regulation X.

110.    As a result of SLS's actions, SLS is liable to the Poultons for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

111.    Additionally, the Poultons request reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

### COUNT THREE:
### VIOLATIONS OF THE FDCPA, 15 U.S.C. §§ 1692, *et seq.*

112.    The Poultons restate and incorporate all of the statements and allegations contained in paragraphs 1 through 68 in their entirety, as if fully rewritten herein.

113.    The Poultons are each a "consumer" as each is a natural person who is obligated or allegedly obligated to pay the Loan. 15 U.S.C. § 1692a(3).

114.    The Loan is a "debt" as it is an obligation or alleged obligation of the Poultons' to pay money arising out of a transaction primarily for personal, family, or household purposes—the financing of the Home. 15 U.S.C. § 1692a(5).

115.    SLS is a "debt collector" because it regularly collects or attempts to collect on the Loan and other loans owed to creditors, such as UMB. 15 U.S.C. § 1692a(6).

116.    Per SLS's records, when SLS acquired the servicing rights to the Loan on or around May 5, 2012, SLS claimed that the Poultons were in default of their obligations thereunder, past due and owing for the March 1, 2012 payment, and any payments due thereafter. *See*, 15 U.S.C. § 1692a(6)(F)(iii).

117.    The FDCPA prohibits false, deceptive, or misleading representations in connection with the collection of any debt. 15 U.S.C. § 1692e. The FDCPA provides examples of conduct that violate the provision, such as prohibiting the use of: (1) False representations of the character, amount, or legal status of any debt (15 U.S.C. § 1692e(2)(A)); (2) The threat to take any action

that cannot legally be taken (15 U.S.C. § 1692e(5)); and, (3) False representations or deceptive means to collect or attempt to collect any debt (15 U.S.C. § 1692e(10)).

118.    SLS violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), and 1692e(10), by failing to properly service the Loan so as to create an improper, unwarranted, and undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan and then falsely representing such amounts as due and owing thereby manufacturing a default and threatening to initiate foreclosure proceedings.

119.    The FDCPA prohibits the use of unfair or unconscionable means to collect or attempt to collect any debt. 15 U.S.C. § 1692f.

120.    SLS violated 15 U.S.C. § 1692f through its actions in improperly servicing the Loan so as to create an improper, unwarranted, and undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan, in demanding payment of such amounts, and in manufacturing a default and threatening to initiate foreclosure proceedings due to the Poultons' inability to pay such unwarranted amounts.

121.    SLS's actions have caused the Poultons to suffer actual damages, further described, *supra*, including but not limited to requiring the Poultons to incur attorneys' fees and costs related to the preparation and mailing of RFI #1, NOE #1, and NOE # 3 in order to obtain information related to the Loan and attempt to have SLS correct its erroneous conduct.

122.    As a result of SLS's conduct, the Pultons suffered extreme emotional distress driven by the fear that SLS's actions would lead to an unwarranted foreclosure of and the loss of and eviction from their Home which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

123.     As a result of SLS's actions, SLS is liable to the Poultons for actual damages and statutory damages. 15 U.S.C. § 1692k(a)(1).

124.     Additionally, the Poultons request reasonable attorneys' fees and costs incurred in connection with this action. 15 U.S.C. § 1692k(a)(3).

**COUNT FOUR:**
**VIOLATIONS OF THE RMLA, R.C. 1322.01, *et seq.***

125.     The Poultons restate and incorporate all of the statements and allegations contained in paragraphs 1 through 68 in their entirety, as if fully rewritten herein.

126.     "No person ... shall act as a … mortgage servicer … without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a … mortgage servicer ... in this state." R.C. 1322.07(A).

127.     SLS, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

128.     SLS is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued SLS certificates of registration, License Nos. RM.850107.000, RM.850107.001-BR, andRM.850107.002-BR, and RM.804016.025-BR. R.C. 1322.01(GG).

129.     The Poultons are each a buyer as defined by the RMLA, as the Loan is serviced by SLS, a mortgage servicer. R.C. 1322.01(H).

130.     A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.* cannot:

> (B) Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other

> means, or engage in a continued course of misrepresentations; [or]
>
> (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings[.]

R.C. 1322.40.

131.    SLS, in, *inter alia*, improperly servicing the Loan so as to create an improper, unwarranted, and undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan, in demanding payment of such amounts, and in manufacturing a default threatening to initiate foreclosure proceedings due to the Poultons' inability to pay such unwarranted amounts, engaged in a continued course of misrepresentations by making false or misleading statements of a material fact. R.C. 1322.40(B).

132.    SLS's conduct, in, *inter alia*, improperly servicing the Loan so as to create an improper, unwarranted, and undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan, in demanding payment of such amounts, in manufacturing a default, and threatening to initiate foreclosure proceedings due to the Poultons' inability to pay such unwarranted amounts, constitutes violations of R.C. 1322.40(C).

133.    SLS's conduct caused the Poultons to suffer actual damages, as further described, *supra*.

134.    As a result of SLS's conduct, SLS is liable to the Poultons for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52.

135.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law and:

> (3) Act with reasonable skill, care, and diligence; [and]

(4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan[.]

R.C. 1322.45(A).

136. A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

137. SLS's conduct in, *inter alia*, improperly servicing the Loan so as to create an improper, unwarranted, and undisclosed balloon payment in excess of $27,314.76 upon the maturity of the Loan, in demanding payment of such amounts, in manufacturing a default, and threatening to initiate foreclosure proceedings due to the Poultons' inability to pay such unwarranted amounts, constitutes violations of R.C. 1322.45(A)(3)-(4).

138. As a result of SLS's conduct, SLS is liable to the Poultons for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.45(D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Daniela Poulton and Charles A. Poulton pray that this Court grant judgment against Defendant Specialized Loan Servicing, LLC and award her the following:

A. Actual damages from Defendant Specialized Loan Servicing, LLC in an amount to be determined at trial for the allegations contained in Counts One through Four;

B. An award of statutory damages of Two Thousand Dollars ($2,000.00) from Defendant Specialized Loan Servicing, LLC for each violation of RESPA contained in Counts One and Two for a total of Four Thousand Dollars ($4,000.00);

C.      An award of statutory damages of One Thousand Dollars ($1,000.00) from
        Defendant Specialized Loan Servicing, LLC for the violations of the FDCPA
        contained in Count Three;

D.      For punitive damages against Defendant Specialized Loan Servicing, LLC as to
        Count Four;

E.      For attorney's fees and costs as to Counts One through Four; and,

F.      For such other relief which this Court may deem appropriate.

Respectfully submitted,

*/s/Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
Telephone: (216)373-0539
Facsimile: (216)373-0536
notices@dannlaw.com


## JURY DEMAND

Plaintiffs Daniela Poulton and Charles A. Poulton hereby request a trial by jury on all

issues, with the maximum number of jurors permitted by law.

*/s/Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
DannLaw