# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### AKRON DIVISION

| | |
|---|---|
| **DANIELA POULTON**, *et al.*, | Case No. 5:22-cv-00251-SL |
| Plaintiffs, | Judge Sara Lioi |
| v. | Magistrate Judge Amanda M. Knapp |
| **SPECIALIZED LOAN SERVICING, LLC**, | |
| Defendant. | |

---

## PLAINTIFFS DANIELA POULTON AND CHARLES A. POULTON'S RESPONSE IN OPPOSITION TO DEFENDANT SPECIALIZED LOAN SERVICING, LLC'S MOTION TO DISMISS

---

**DANN LAW**
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
Michael A. Smith Jr. (0097147)
15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiffs Daniela Poulton and Charles A. Poulton*

# **TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND............................................................................................. 1

II.  LEGAL STANDARD ................................................................................................... 4

III. ARGUMENT ................................................................................................................ 4

   A. SLS FAILED TO PROPERLY RESPOND TO THE RFI .................................................. 4

   B. SLS FAILED TO PERFORM A REASONABLE INVESTIGATION INTO THE
      ERRORS ASSERTED BY NOE #1 .................................................................................. 7

   C. SLS VIOLATED THE FDCPA...................................................................................... 10

   D. THE RMLA APPLIES TO SLS AND SLS VIOLATED THE RMLA ........................... 13

IV.  CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITIES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 3

*Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126 (11th Cir. 2014) ........................................ 8

*Bauer v. Roundpoint Mortg. Servicing Corp.*, No. 18 C 3634,
    2018 U.S. Dist. LEXIS 184328 (N.D. Ill. Oct. 29, 2018) ........................................................ 8

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ................................................................. 3

*Bellante v. Ohio DOC*, 8th Dist. Cuyahoga No. 86712, 2006-Ohio-2472 ................................. 14

*Bordeaux v. LTD Fin. Servs.*, L.P., No. 2:16-0243 (KSH) (CLW),
    2017 U.S. Dist. LEXIS 212757, (D.N.J. Dec. 28, 2017) ........................................................ 11

*Carter*, 553 F.3d 979, n.5 (6th Cir. 2009) ......................................................................... 3

*Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir. 2014) .......................................... 11

*Everhart v. Credit Vision*, No. 1:20-cv-670, 2021
    U.S. Dist. LEXIS 208754, n.3 (S.D. Ohio Oct. 8, 2021) ........................................................ 11

*Hackett v. Wells Fargo Bank, N.A.*, No. 2:17-CV-07354-CAS-ASx,
    2019 U.S. Dist. LEXIS 193296, (C.D. Cal. Nov. 4, 2019) ...................................................... 9

*Hanlin v. Ohio Builders & Remodelers, Inc.*, 196 F. Supp. 2d 572 (S.D. Ohio 2001) ................ 14

*Hovermale v. Immediate Credit Recovery, Inc.*, No. 15-05646 (RBK/JS),
    2018 U.S. Dist. LEXIS 204601 (D.N.J. Dec. 3, 2018) .......................................................... 11

*In re Carter*, 553 F.3d 979, 985-86, n.5 (6th Cir. 2009) ...................................................... 3

*Keys v. Humana, Inc.*, 684 F.3d 605 (6th Cir. 2012) ............................................................ 3

*Lashua v. Lakeside Title & Escrow Agency*,
    5th Dist. Stark No. 2004CA00237, 2005-Ohio-1728 ............................................................ 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 10

*Marais v. Chase Home Fin. LLC*, 736 F.3d 711 (6th Cir. 2013) .............................................. 3

*Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712 (S.D. Ohio 2014) ................................... 8

*Mayfield v. Ltd Financial Servs., L.P.,*
 2021 U.S. Dist. LEXIS 188079, (S.D.Tex., Sept. 30, 2021) .................................................. 11

*Morton v. O'Brien*, No. 2:18-cv-445,
 2022 U.S. Dist. LEXIS 59282, (S.D. Ohio Mar. 31, 2022) .............................................. 11, 12

*Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905 (11th Cir. 2016) .............................. 7

*Poynter v. Rushmore Loan Mgmt. Servs. LLC*, No. 1:20-cv-247,
 2022 U.S. Dist. LEXIS 45343 (S.D. Ohio Mar. 15, 2022) ........................................................ 9

*Schultz v. Midland Credit Mgmt.*, Civil Action No. 16-4415,
 2020 U.S. Dist. LEXIS 98824, (D.N.J. June 5, 2020) ............................................................. 11

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................................. 10

*Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443 (6th Cir. 2014) ........................... 9, 10

*Velez-Aguilar v. Sequium Asset Sols., LLC*, No. 2:21-cv-14046 (WJM),
 2022 U.S. Dist. LEXIS 8842, (D.N.J. Jan. 18, 2022) ............................................................. 11

*Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014) .............................................. 8

## Other Authorities

Ohio House Bill 199 ("HB 199").................................................................................................. 13

R.C. 1322.01 ............................................................................................................................... 13

## Statutes, Regulations and Rules

12 C.F.R. § 1024.35 .................................................................................................................. 7, 9

12 C.F.R. § 1024.35(e)(1) ............................................................................................................. 7

12 C.F.R. § 1024.36 ...................................................................................................................... 6

12 C.F.R. § 1024.36(f)(1)(i) ......................................................................................................... 5

12 C.F.R. § 1024.36(f)(1)(iii) ....................................................................................................... 5

12 C.F.R. § 1024.36(f)(1)(iv) ........................................................................................................ 5

12 C.F.R. § 1024.36(f)(1)(v) ......................................................................................................... 5

12 C.F.R. § 1024.36(f). ................................................................................................................. 5

12 C.F.R. § 1024.38(c)(2)(i) ........................................................................................ 5

12 C.F.R. § 1024.38(c)(2)(iii) ..................................................................................... 5

12 C.F.R. § 226.5b(d)(5)(1), n. 10b ............................................................................ 7

12 C.F.R. § 36(f)(1)(ii) ................................................................................................ 6

12 U.S.C. § 2601(a) ..................................................................................................... 4

15 U.S.C. § 1692(e) ..................................................................................................... 9

# I.     FACTUAL BACKGROUND

Plaintiffs Daniela Poulton and Charles A. Poulton (the "Poultons" or "Plaintiffs") bring four claims against Defendant Specialized Loan Servicing, LLC ("SLS" or "Defendant") for violations of the Real Estate Settlement Procedures Act (RESPA), Fair Debt Collection Practices Act (FDCPA), and the Ohio Residential Mortgage Lending Act (RMLA). *See* (Doc. 1).

In 2009, the Poultons sought loss mitigation assistance from non-party E*Trade Financial ("E*Trade"), the prior servicer of the Loan. (Doc. 1 at 5, ¶ 30). In November 2009, the Poultons executed and returned a "Modification Acceptance Letter" concerning the Loan (the "Modification") along with the first modified payment. (Doc. 1 at 6, ¶ 31; Doc. 1-3). The terms of the Modification were as follows:

- The new interest rate will be 3.25% for 24 months.
- The first modified payment will be due on November 27, 2009 in the amount of $646.46.
- All currently outstanding late fees will be waived
- Any and all other terms and conditions of the above loan not specifically mentioned in this letter will remain unchanged.
- All funds collected for the loan modification are non-refundable and will be applied to your account balance.

(Doc. 1-3). Neither the terms of the Modification nor E*Trade informed the Poultons that entering into the Modification would have any negative impact or consequences upon the amortization of the Loan nor that there would be any balloon payment due and owing on the Loan upon the maturity of the Loan. (Doc. 1 at 6, ¶ 33).

The Poultons also received a Loss Mitigation Modifications worksheet (the "Worksheet") that commemorated, memorialized, and delineated the differences in the terms, interest rate, and amounts owed under the Loan and as modified through the Modification. (Doc. 1-4). As listed in the Worksheet, once modified:

a.   The interest rate for the Loan would change from 7.75% to 3.25%;
b.   The due date for the Loan would change from September 1, 2009 to January 1,

2010;

c. The remaining term of the Loan would remain at 139 months;
d. The monthly payment amount would change from $764.94 to $646.46;
e. Late fees of $1114.72 would be waived;
f. Interest payments of $561.39 were waived; and,
g. Any balloon payment owing on the Loan would remain at $0.00.

(Doc. 1-4). The Poultons continued to remit their monthly payments under the terms of the Loan as modified per the Modification to their mortgage servicers. (Doc. 1 at 7, ¶ 36).

After remitting all monthly payments through the end of the Loan's term, upon maturity of the Loan—on September 1, 2020—SLS claimed that the Poultons still owed $27,314.76 in unpaid principal, payable as a balloon payment. (Doc. 1 at 7, ¶ 37). Had the Poultons been advised that through the Modification they would only reduce their monthly payment by approximately $100.00, but be required to remit a balloon payment upon maturity in excess of $27,000.00, the Poultons would not have entered into the Modification. (Doc. 1 at 7, ¶ 38). Had the amortization for the Loan not been altered or negatively impacted through the implementation of the Modification without notification, the Loan would have been paid in full as of the maturity date. (Doc. 1 at 7, ¶ 39). Upon information and belief, the Modification was not properly implemented and/or the Poultons' payments thereunder were not properly applied to the Loan as modified through the stated terms of the Modification. (Doc. 1 at 7, ¶ 40).

On or about August 11, 2021, the Poultons, through counsel, sent a request for information to SLS (the "RFI"). (Doc. 1-5). Through the RFI, the Poultons requested information related to the Loan including, *inter alia*, a transaction history for the Loan, servicing notes for the Loan, and correspondence concerning loss mitigation. (Doc. 1-5). SLS sent correspondence in response to the RFI dated August 23, 2021 (the "RFI Response"). (Doc. 1-7). Through the Response, SLS failed to provide a full transaction history for the Loan, as requested, and instead only provided a history containing transactions for the loan dating back to May 21, 2012. (Doc. 1 at 9, ¶ 47).

As the Poultons had, on numerous occasions, expressed concern about the accounting of the Loan since the Modification, SLS knew or should have known that a transaction history dating back at least as far as the implementation of the Modification was of utmost importance. (Doc. 1 at 9, ¶ 48). Had SLS provided a full accounting of the Loan as requested through the RFI, the Poultons and their counsel may have been more readily able to determine why there was an unpaid principal balance owed upon the maturity of the Loan and what specific errors created the untenable situation in which the Poultons find themselves. (Doc. 1 at 9, ¶ 49).

On or about August 11, 2021, the Poultons, through counsel, sent a notice of error to SLS for its failure to properly service the Loan by creating and imposing an undisclosed balloon payment and for sending the Poultons incorrect mortgage statements ("NOE #1"). (Doc. 1-7). SLS sent correspondence dated December 6, 2021 in response to NOE #1 (the "NOE Response"). (Doc. 1-8). SLS, through the NOE Response, stated that no errors occurred because:

> SLS records [*sic*] indicate that the remaining balance due on the above referenced second mortgage loan account ***is not due to any balloon payment*** [emphasis added]. Per the terms of original Note [*sic*], in Section 3 "Payments" it states in part:
> *"If on September 1, 2020 I still owe amounts under the note, I will pay all those amounts, in full, on that date."* [Emphasis in original]
> The 2009 loan Modification executed with prior servicer E-Trade states in part:
> *"Any and all other terms and conditions of the above loan not specifically mentioned in this letter will remain unchanged."* [Emphasis in original]

(Doc. 1-8). On or about February 8, 2022, the Poultons, through counsel, sent a second notice of error to SLS at the Designated Address for its failure to properly respond to the RFI, failure to properly respond to NOE #1, and reiterating the errors previously alleged through NOE #1, but including additional information not previously provided with NOE #1 that is likely to change SLS's determination as to whether any errors occurred ("NOE #2"). (Doc. 1-9).

As a result of SLS's actions, SLS is attempting to collect an undisclosed balloon payment

which has caused the Poultons to become delinquent on the Loan and suffer credit diminution. (Doc. 1 at 12, ¶ 62). Due to the manufactured default resulting from SLS's actions, SLS has further issued notices of its intent to foreclose to the Poultons, threatening foreclosure if the Poultons fail to pay for the improper, undisclosed balloon payment. (Doc. 1 at 12, ¶ 63). SLS's improper actions have caused the Poultons to suffer from actual and proximate damages, including, but not limited to: (1) attorneys' fees and costs related to the RFI, NOE #1, and NOE #2; (2) unwarranted harm to their credit rating and a significant delay in the rehabilitation of their credit; (3) improper fees and charges imposed on the Loan; and, (4) severe emotional distress. (Doc. 1 at 12-13, ¶ 64).

## II.     LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Courts must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). The Complaint meets and exceeds these standards.

## III.     ARGUMENT

## A.     SLS FAILED TO PROPERLY RESPOND TO THE RFI

"As a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (citing *In re Carter*, 553 F.3d 979, 985-86, n.5 (6th Cir. 2009)). RESPA was enacted, in part, to ensure "that consumers throughout the Nation are provided with greater and more timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive

practices that have developed in some areas of the country." 12 U.S.C. § 2601(a).

RFI #1 requested, *inter alia*, the following information from SLS: (1) "An exact reproduction of the life of loan mortgage transaction history for this loan from the contract system of record from your electronic software program for this loan"; and (2) "Copies of any and all servicing notes related to your servicing of the above-referenced mortgage loan from January 10, 2014". (Doc. 1-5). SLS only provided a partial transaction history for the Loan, from May 21, 2012 onward, and failed to provide any servicing notes. *See* (Doc. 1-6).

SLS wrongfully claims that the RFI "did not request SLS provide [a full accounting for the Loan dating back to at least the date of the Modification]." *See* (Doc. 6 at 134). In support of this erroneous conclusion, SLS claims that the phrase "from **your** electronic software program for this loan" limits the Poultons' request to the "transaction history from [SLS's] own system." *See* (Doc. 6 at 135) (emphasis made by SLS). However, a reading of the full sentence shows that the Poultons requested a **life** of loan mortgage transaction history, meaning a history for the entire existence of the loan. The remainder of the sentence that SLS hangs its hat on is describing the form by which that information is displayed, not the substance.

Even it the RFI was ambiguous, the Poultons "clarified" exactly what information they sought through NOE #2. (Doc. 1-9). The Poultons informed SLS that:

> SLS provided a partial transaction history for the Loan, but the first entry on such history was dated May 21, 2012. The Loan was modified via an agreement effective November 27, 2009 (the "Modification"). The Borrowers have called into question via notice(s) of error(s), and otherwise, that there were errors regarding the Modification, the implementation thereof, and an undisclosed balloon payment thereunder, so it is imperative that SLS provide an accounting for the Loan encompassing such time.

(Doc. 1-9). Despite receipt of NOE #2, SLS has not provided a life of loan mortgage transaction history to date.

Tellingly, SLS does not specifically explain why it cannot provide a full transaction history and instead relies on boiler plate language derived from 12 C.F.R. § 1024.36(f). Since this information was not previously provided to the Poultons, it cannot be "duplicative information". *See* 12 C.F.R. § 1024.36(f)(1)(i). Since SLS provided a partial transaction history, such information cannot be "confidential, proprietary, or privileged information". *See* 12 C.F.R. § 1024.36(f)(1)(ii). It is undisputed that information related to payments made towards the Loan are directly related to the Loan itself, and therefore such information cannot be "irrelevant information". *See* 12 C.F.R. § 1024.36(f)(1)(iii). Mortgage servicers are required to maintain a "servicing file" that includes "[a] schedule of **all** transactions credited or debited to the mortgage loan account." 12 C.F.R. § 1024.38(c)(2)(i). Therefore, since SLS is required to have records of **all** transactions, including from the 2009 Modification to present, SLS cannot claim that such information is "overboard or unduly burdensome". *See* 12 C.F.R. § 1024.36(f)(1)(iv). When the Poultons sent the RFI to SLS, SLS was the entity responsible for servicing the Loan and the Loan was not discharged. *See* 12 C.F.R. § 1024.36(f)(1)(v).

None of the above exceptions allow SLS to ignore its RESPA obligations. SLS is claiming that the Poultons owe amounts in excess of $27,314.76, but failing to provide a full transaction history that shows this. Further, SLS provided some documents from E*Trade through the RFI Response, so there is no indication that SLS does not have access to a full transaction history.

SLS does not address its failure to provide servicing notes in the Motion. For the same reasons discussed, *supra*, SLS cannot rely on 12 C.F.R. § 1024.36(f)(1)(i), (iii), (iv), or (v) to ignore its REPSA obligations. *See also* 12 C.F.R. § 1024.38(c)(2)(iii) (requiring the service file to contain "[a]ny notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account"). Servicing notes cannot be considered "confidential,

proprietary, or privileged information" pursuant to 12 C.F.R. § 1024.36(f)(1)(ii) because servicing notes do not bear any resemblance to the types of requests deemed "confidential, proprietary, or privileged" by the CFPB. *See* CFPB Official Interpretation No. 1 to 12 C.F.R. § 36(f)(1)(ii).

RESPA, a remedial statute with the purpose of providing greater information and protecting from abusive practices, requires SLS to maintain a full life of loan transaction history and servicing notes. The Poultons are permitted to request information related to the Loan with minimal constraints that are not present in the instant matter. SLS's failure to provide a full life of loan transaction history and servicing notes is a clear violation of 12 C.F.R. § 1024.36.

## B. SLS FAILED TO PERFORM A REASONABLE INVESTIGATION INTO THE ERRORS ASSERTED BY NOE #1

Despite remitting all monthly payments through the end of the Loan's term after the Loan was modified, SLS claimed that the Poultons' owed unpaid principal. (Doc. 1 at 7, ¶ 37). Neither the terms of the Modification nor E*Trade informed the Poultons that entering into the Modification would have any negative impact or consequences upon the amortization of the Loan nor that there would be any balloon payment due and owing on the Loan upon the maturity of the Loan. (Doc. 1 at 7, ¶ 36). To the contrary, the Worksheet clearly states that there were no amounts owed as a balloon payment both before and after the modification of the Loan:



(Doc. 1-4). The use of the number "0" has significance, as the Worksheet uses N/A (written as a long dash) or blank values when deemed appropriate. *See* (Doc. 1-4).

As a result of SLS attempting to collect amounts that the Poultons were not required to pay, they sent NOE #1 to SLS. (Doc. 1-7). NOE #1 asserted that SLS failed to properly service the Loan by creating and imposing an undisclosed balloon payment and subsequently sending the

Poultons incorrect mortgage statements. (Doc. 1-7). Through the NOE Response, SLS wholly failed to address the errors alleged through NOE #1 that the Modification or the implementation thereof improperly affected the amortization of the Loan which resulted in the principal of the Loan not being paid off in full as well as any of the errors concerning the periodic billing statements. (Doc 1 at 10-11, ¶ 55). Instead, SLS merely relied upon a clause in the Note stating that all unpaid amounts under the Loan are due and payable upon the maturity of the Loan without any consideration as to whether there being an unpaid principal balance was proper. (Doc. 1 at 11, ¶ 56).

RESPA requires that a servicer either correct asserted errors or conduct a reasonable investigation before responding to a borrower that it determined that no error had occurred. 12 C.F.R. § 1024.35(e)(1). A servicer's non-responsive, conflicting, or factually incorrect responses can be evidence of a failure to conduct a reasonable investigation. *See Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905, 909-910 (11th Cir. 2016) (reversing dismissal of a RESPA claim where servicer's responses to notice of error contradicted the history of the loan and failed to acknowledge its error).

The NOE Response establishes that SLS failed to perform a reasonable investigation into the errors asserted by NOE #1. First, "[a] balloon payment results if paying the minimum periodic payments does not fully amortize the outstanding balance by a specified date or time, and the consumer must repay the entire outstanding balance at such time." *See* 12 C.F.R. § 226.5b(d)(5)(1), n. 10b (defining a balloon payment for purposes of Regulation Z). Requiring the Poultons to pay the remaining unpaid principal balance after all periodic payments have been made is, in and of itself, a balloon payment.

Second, as discussed, *supra*, the Worksheet established a balloon payment of "0" after

modification of the Loan. (Doc. 1-4). Nothing in the Modification or Worksheet states that any other amount will be required at the Loan's maturity. *See* (Doc. 1-3; Doc. 1-4). Thus, since the Poultons remitted all of their payments pursuant to the Modification, they do not "owe amounts under the note" and SLS cannot use Section 3 of the Note to impermissibly alter the terms of the Modification.

The Poultons do not merely "disagree" with SLS's determination. SLS's determination contradicts the Worksheet and SLS has pointed to nothing that specifically gave it the right to seek this balloon payment from the Poultons. Instead, the only support offered by SLS is the general language of Section 3 of the Note, which requires amounts to be owed before SLS can demand them at the Loan's maturity.

SLS's reliance on *Bauer v. Roundpoint Mortg. Servicing Corp.*, No. 18 C 3634, 2018 U.S. Dist. LEXIS 184328 (N.D. Ill. Oct. 29, 2018) is inapposite because the case it cites, *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126 (11th Cir. 2014) (also relied upon by SLS in the Motion) pre-dates the implementation of the "reasonableness" requirement. *See Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014) ("The addition of the word 'reasonable' seemingly imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons."); *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 724 (S.D. Ohio 2014) ("Chase also made no effort, beyond what has already been discussed, to explain or clarify why it felt that Marais' account was correct or the fees assessed against her appropriate."). A reasonable investigation into the errors asserted by NOE #1 would involve a review of the Worksheet, which SLS never addressed. Upon review, SLS would have realized that E*Trade drafted and provided the Poultons with the Worksheet which outlined that no balloon payment would be imposed (assuming the Poultons made all the required

9

monthly payments, which they did).

SLS's reliance on *Poynter v. Rushmore Loan Mgmt. Servs. LLC*, No. 1:20-cv-247, 2022 U.S. Dist. LEXIS 45343 (S.D. Ohio Mar. 15, 2022) is misplaced because the servicer that drafted the notice of error response at issue in *Poynter* "fully addressed" the errors that the plaintiff presented. *Id.* at *21. In *Poynter*, the plaintiff claimed that the current mortgage servicer was seeking to collect amounts in excess of what the prior mortgage servicer was demanding. *Id.* at *19-21. The differences amounted to a "difference in presentation", which the current mortgage servicer explained in the notice of error response. *Id.* at *21-22. Further, *Poynter* involved a motion for summary judgment, and not a motion to dismiss, and the plaintiff was afforded the opportunity to conduct discovery to obtain evidence to support his RESPA claims. The NOE Response does not involve anywhere near the same amount of explanation as the response in *Poynter*. SLS did not need to perform anything similar to a "full account review" to discover that the Modification and Worksheet established no balloon payment and never informed the Poultons otherwise.

The reasonableness of a response to a notice of error is an issue of fact. *Hackett v. Wells Fargo Bank, N.A.*, No. 2:17-CV-07354-CAS-ASx, 2019 U.S. Dist. LEXIS 193296, at *28 (C.D. Cal. Nov. 4, 2019). The parties disagree whether SLS's investigation was in fact reasonable and this issue is not suitable for resolution at the pleading stage. For the reasons discussed, SLS fails to meet its burden to show that the Poultons fail to state a claim in Count Two for violations of 12 C.F.R. § 1024.35.

## C.    SLS VIOLATED THE FDCPA

The FDCPA was enacted to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). "The Fair Debt Collection Practices Act is an extraordinarily broad statute and must be construed accordingly." *Stratton v. Portfolio Recovery Assocs., LLC*,

770 F.3d 443, 448 (6th Cir. 2014). "The FDCPA is a strict-liability statute: A plaintiff does not need to prove knowledge or intent." *Id.* at 448-449.

SLS claims that the Poultons "fail to identify any communication by SLS that could be construed as an attempt to collect a debt … that was materially misleading, unfair, or unconscionable." (Doc. 6 at 139). The Poultons are not required to prove their case at the pleading stage, only plausibly allege a claim. However, SLS has provided information and documents with its Motion that shows the communications that were received by the Poultons. *See* SLS's Demands for Payment dated February 24, 2021 (Doc. 6-2 at 191), March 26, 2021 (Doc. 6-2 at 188), and May 10, 2021 (Doc. 6-2 at 197). SLS subsequently continued to attempt to collect unwarranted amounts. *See* (Doc. 6 at 130). The Complaint was filed on February 15, 2022, so these communications are within the statute of limitations (as are other documents in the parties' possession that were not attached to the Complaint). As discussed, *supra*, SLS had no authority to demand a balloon payment from the Poultons (and subsequently threaten foreclosure) and should the Court agree, SLS is strictly liable for its actions.

Article III of the Constitution limits the federal courts to adjudication of "Cases" and "Controversies". *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Standing requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 338. An injury-in-fact requires the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

"[M]ost courts across the country... have found that an alleged FDCPA violation alone is sufficient to confer standing because it establishes that the consumer suffered the type of harm

Congress intended to prevent." *Everhart v. Credit Vision*, No. 1:20-cv-670, 2021 U.S. Dist. LEXIS 208754, at *4 n.3 (S.D. Ohio Oct. 8, 2021) (quoting *Mayfield v. Ltd Financial Servs., L.P.*, 2021 U.S. Dist. LEXIS 188079, at *8-9 (S.D.Tex., Sept. 30, 2021)); *Schultz v. Midland Credit Mgmt.*, Civil Action No. 16-4415, 2020 U.S. Dist. LEXIS 98824, at *8 (D.N.J. June 5, 2020) ("[B]y receiving collection letters that were allegedly false, deceptive, or misleading in violation of Section 1692e, Plaintiffs have Article III standing to sue.").

"[T]he intangible harm of receiving false and misleading statements has a close relationship to the 'traditional causes of action for fraud and deceit.'" *Velez-Aguilar v. Sequium Asset Sols., LLC*, No. 2:21-cv-14046 (WJM), 2022 U.S. Dist. LEXIS 8842, at *10 (D.N.J. Jan. 18, 2022) (citing *Hovermale v. Immediate Credit Recovery, Inc.*, No. 15-05646 (RBK/JS), 2018 U.S. Dist. LEXIS 204601 (D.N.J. Dec. 3, 2018)). In *Hovermale*, the court held that the consumer showed a concrete injury in fact by stating that the debt collector sent her a letter including "materially misleading late charges language" when the debt collector "had no lawful right to assess late charges". *Id.* at *12.

In the instant matter, SLS engaged in similar conduct--demanding the improper balloon payment and additional interest and late fees based on that balloon payment. (Doc. 1 at 12-13, ¶ 64). This conduct "implicates a core concern animating the FDCPA" - "a right to receive accurate and non-misleading information." *See Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303-304 (3d Cir. 2014); *Bordeaux v. LTD Fin. Servs.*, L.P., No. 2:16-0243 (KSH) (CLW), 2017 U.S. Dist. LEXIS 212757, at *3 (D.N.J. Dec. 28, 2017); *see Hovermale*, 2018 U.S. Dist. LEXIS 204601, at *8.

Further, emotional distress is "well within the type [of injuries] recognized by courts are sufficiently concrete to satisfy the standing requirement." *Morton v. O'Brien*, No. 2:18-cv-445,

2022 U.S. Dist. LEXIS 59282, at *6-7 (S.D. Ohio Mar. 31, 2022) (collecting cases). As a result of SLS's conduct, the Poultons suffered extreme emotional distress driven by the fear that SLS's actions would lead to an unwarranted foreclosure of and the loss of and eviction from their Home which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress. (Doc. 1 at 23, ¶ 122). This fear is certainly warranted, as SLS has issued notices of its intent to foreclose to the Poultons and if the Poultons did not pay the improper balloon payment, loss of their home is "certainly impending". (Doc. 1 at 12, ¶ 63).

As a direct and proximate result of SLS's attempts to collect amounts that the Poultons did not owe, they engaged the services of counsel to attempt to obtain information related to the Loan and correct SLS's errors. (Doc. 1 at 23, ¶ 121). Had SLS serviced the Loan correctly, the Poultons would have not incurred attorneys' fees and postage costs related to the RFI and the NOEs.

## D.    THE RMLA APPLIES TO SLS AND SLS VIOLATED THE RMLA

The Poultons' analysis as stated in the previous section equally applies to their state statutory claim. The Complaint alleges that SLS, through its attempts to collect unauthorized amounts and threats to foreclose if the Poultons failed to pay discussed, *supra*, violated R.C. 1322.40(B) as false and misleading statements, R.C. 1322.40(C) as improper and dishonest dealings, R.C. 1322.45(A)(3) as the failure to act with reasonable skill, care, and diligence, and R.C. 1322.45(A)(4) as the failure to act in good faith and with fair dealing. *See* (Doc. 1 at 25-26, ¶¶ 131-132, 137). SLS's conduct violates all of the above sections of the RMLA and directly and proximately resulted in actual damages as pled in paragraph 64 of the Complaint. (Doc. 1 at 12-13, ¶ 64).

When the Loan was originated has no bearing on whether a mortgage servicer violated the RMLA. On December 22, 2017, Ohio Governor John Kasich ("Kasich") signed into law Ohio

13

House Bill 199 ("HB 199"), which made significant changes to R.C. 1322.01, *et seq.*, formerly the Ohio Mortgage Brokers Act (OMBA). HB 199 substantially broadened the scope of the statute, now called the Ohio Residential Mortgage Lending Act, to apply to mortgage lenders. On December 19, 2018, Kasich signed into law Ohio House Bill 489 ("HB 489"), to again broaden the scope of the statute to apply to mortgage servicers. The RMLA was amended to protect mortgage borrowers from wrongful conduct by mortgage lenders and mortgage servicers.

On March 13, 2018, the Ohio Division of Financial Institutions ("ODFI") published the HB 199 Implementation Guidance (the "Guidance"). The question answered by the ODFI is: "Once the new law goes into effect on March 23, 2018, **what are my responsibilities under the prior laws?**" (Doc. 6-3 at 203) (emphasis added). The answer states that business activities up to March 23, 2018 are governed by the laws in effect at the time the loan was originated and the prior laws will still apply until the loan and all associated recordkeeping requirements are extinguished. (Doc. 6-3 at 203). Missing from this answer (because it does not apply to the question presented) is any suggestion that the amended RMLA does not apply to business activities after March 23, 2018.

It is unclear how the Guidance applies to mortgage servicers when the statute was not amended to apply to mortgage servicers until months later. A homeowner's relationship with a mortgage broker or mortgage lender is limited to a single act--purchasing a home. In contrast, a homeowner's relationship with a mortgage servicer can last fifteen, thirty, or more years and it is not uncommon for the servicing rights to a homeowner's loan to change multiple times over the life of a loan. SLS fails to attach any guidance from the ODFI on how mortgage servicers should act pursuant to the RMLA and prior laws. Absent evidence of such guidance, there is no indication that business activities conducted after the amendments to the RMLA are to be grandfathered into

the rules in existence at the time the loan originated.

Nonetheless, when the Loan was originated on August 26, 2005, mortgage brokers were required to follow R.C. 1322.40(B) and (C) which were numbered R.C. 1322.07(B) and (C). *See e.g. Hanlin v. Ohio Builders & Remodelers, Inc.*, 196 F. Supp. 2d 572, 583 (S.D. Ohio 2001); *Lashua v. Lakeside Title & Escrow Agency*, 5th Dist. Stark No. 2004CA00237, 2005-Ohio-1728, ¶ 35-36 *Bellante v. Ohio DOC*, 8th Dist. Cuyahoga No. 86712, 2006-Ohio-2472, ¶ 12, fn. 3.

## IV.     CONCLUSION

The Poultons have sufficiently pled their claims against SLS and the Motion should be denied in its entirety.

**WHEREFORE**, Plaintiffs Daniela Poulton and Charles A. Poulton respectfully request this Court deny Defendant Specialized Loan Servicing, LLC's motion to dismiss in its entirety.

Respectfully submitted,

/s/ *Marc E. Dann*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
Michael A. Smith Jr. (0097147)
**DANN LAW**
15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiffs Daniela Poulton and Charles A. Poulton*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 26, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ *Marc E. Dann*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
Michael A. Smith Jr. (0097147)
**DANN LAW**
*Counsel for Plaintiffs Daniela Poulton*
*and Charles A. Poulton*